IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Civil Action No.

SECURITIES AND EXCHANGE COMMISSION,
Central Regional Office
1801 California Street, Suite 1500
Denver, CO 80202

                *Plaintiff,*         Civil No. 1:07-cv-37-JM

v.

GAYLE SPENCE LUACAW
P.O. Box 324
Newfields, NH 03856

                *Defendant.*

---

# COMPLAINT

---

Plaintiff Securities and Exchange Commission ("SEC"), for its complaint, alleges:

1) From March 2000 through December 2001 (the "relevant period"), Gayle Spence Luacaw ("Luacaw"), a former employee of Cabletron Systems, Inc. ("Cabletron") and its former subsidiary Enterasys Networks, Inc. ("Enterasys"), participated in a scheme to inflate revenues of Enterasys and Cabletron (which are jointly referred to herein as "Enterasys") and thereby convince investors that Enterasys was a viable independent company with consistently strong revenue growth.

2) During the relevant period, Luacaw knowingly negotiated, reviewed, or otherwise participated in transactions for which revenue was improperly recognized in Enterasys's financial statements and reported in periodic and other filings with the SEC and in press releases while the company's stock was publicly trading.

3) In carrying out the scheme to improperly inflate Enterasys's revenues, Luacaw also misrepresented information to, or concealed information from, Enterasys's outside auditor concerning the true nature of some of the transactions for which the company improperly recognized revenue.

4) Luacaw participated in Enterasys's financial fraud by entering into sales transactions that lacked one or more necessary elements for revenue recognition under generally accepted accounting principles ("GAAP"). In some of these transactions, Luacaw and others entered into undisclosed "side agreements" with purchasers, in which payment for product was contingent upon the purchaser's resale of the product, or the purchaser was granted full return, exchange, or cancellation rights. Luacaw knew, or was reckless in not knowing, that it was improper to recognize revenue on these transactions that were subject to material contingencies.

5) In addition, many of the problematic sales were linked to investments that Enterasys made in unaffiliated, privately-held companies in return for the investee company's agreement to use the investment proceeds to buy products from Enterasys and its former subsidiary, Aprisma Management Technologies, Inc. ("Aprisma"). Luacaw knew, or was reckless in not knowing, that Enterasys was not interested in the investment aspect of these transactions, but rather used investments to improperly manage its revenues at quarter end.

6) Moreover, Luacaw was aware that Enterasys, after failing to perform a reasonable valuation for its investment interests, frequently overpaid for investment interests in companies that could not otherwise afford Enterasys's and Aprisma's products and, in

some cases, did not need the products. Accordingly, Luacaw knew, or was reckless in not knowing, that Enterasys's investment transactions lacked economic substance.

7) Knowing that the foregoing circumstances would raise auditor concerns and impair Enterasys's ability to recognize revenue, Luacaw and others on the investment team frequently structured Enterasys's investments as "three-corner deals by inserting a third party reseller between Enterasys and the investee company and requiring the investee company to purchase Enterasys product from the third party reseller. In this manner, Luacaw and others concealed from Enterasys's outside auditor critical revenue information and the fact that several of Enterasys's large sales were linked to reciprocal investments by Enterasys.

8) In addition to lacking economic substance, some of the investment deals in which Luacaw participated were not consummated until the quarter after Enterasys recognized revenue for the related sale. Luacaw knew, or was reckless in not knowing, that it was improper to recognize revenue from sales that were contingent on the finalization of investments in future quarters.

9) During the relevant period, Luacaw and others caused Enterasys to improperly recognize at least $47 million in revenue from sales transactions flawed by one or more of the foregoing deficiencies.

10) The improper revenue was material information because it enabled Enterasys to meet or exceed analysts' consensus pro forma earnings per share estimates. Moreover, Luacaw and others caused Enterasys to overstate by 50% to 600% its announced pro forma earnings per share each quarter during the relevant period. Further, Luacaw and others caused Enterasys to understate its operating losses by 5% to 33% for six quarters during

the relevant period, and to overstate its net revenues by 8% and 25% for the final two quarters of the relevant period.

11) By participating in Enterasys's improper accounting practices, Luacaw and others caused Enterasys to make various materially false statements in numerous SEC filings and other documents, including: Enterasys SEC Form 10-K - for the fiscal year March 1, 2000 to March 3, 2001 ("Fiscal Year 2001 ); Enterasys SEC Forms 10-Q - for the quarters March 1, 2000 to June 3, 2000 ("Q1 Fiscal Year 2001 ), June 4, 2000 to September 2, 2000 ("Q2 Fiscal Year 2001 ), March 4, 2001 to June 2, 2001 ("Q1 Transition Year 2001 ), June 3, 2001 to September 1, 2001 ("Q2 Transition Year 2001 ), and July 1, 2001 to September 29, 2001 ("Q3 Transition Year 2001 ); Enterasys SEC Forms 8-K - filed on March 28, 2001, July 18, 2001, and July 19, 2001 (reporting financial information for Aprisma); Enterasys SEC Form S-8 – filed on August 6, 2001; and all SEC filings/statements incorporating the above documents.

12) Largely as a result of the materially overstated revenue reported by Enterasys, Enterasys was successfully launched as an independent public company on August 6, 2001.

13) During the relevant period, a period in which Enterasys's stock price was artificially inflated due to its material overstatement of revenues, Luacaw realized profits from stock sales and bonuses related to her improper conduct.

14) When Enterasys announced on February 1, 2002 that its accounting and revenue recognition practices were being investigated by the SEC, Enterasys's stock price dropped from $10.80 to $4.20 per share, a loss of approximately 61%.

## I. JURISDICTION AND VENUE

15) The SEC brings this action for injunctive relief under Section 20(b) of the Securities Act of 1933 ("Securities Act ) [15 U.S.C. § 77t(b)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act ) [15 U.S.C. §§ 78u(d) and (e)].

16) This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

17) In connection with the transactions, acts, practices, and courses of business described in this Complaint, Luacaw, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or the mails, or the means and instruments of transportation or communication in interstate commerce or the mails.

18) Venue is proper in this district because certain of the transactions, acts, practices, and courses of business constituting the violations of law alleged herein occurred within this district. Moreover, Luacaw resides in this district.

## II. DEFENDANT

19) Gayle S. Luacaw, age 45, a resident of Newfield, New Hampshire, was a vice president in Enterasys's Executive Office of the President from September 2000 through October 2001. Luacaw began her career with Cabletron in October 1992 as a sales representative and rose to the position of vice president of inside sales before being promoted to work in the executive office. After October 2001, Luacaw resumed her position of vice president of inside sales until she left Enterasys in April 2002. During the relevant period, Luacaw was primarily responsible for coordinating Enterasys's investment deals, meeting with potential companies in which to invest, and obtaining related purchase orders.

### III. LUACAW KNOWINGLY PARTICIPATED IN NUMEROUS SALES TRANSACTIONS FOR WHICH ENTERASYS IMPROPERLY RECOGNIZED REVENUE

#### A. The Ariel Side Agreement

20) On August 31, 2001, one day before the end of the second quarter of Transition Year 2001, Ariel International Technology Co. Ltd ("Ariel"), a company based in Hong Kong, submitted a $4 million purchase order to Enterasys that cross-referenced an associated letter agreement. Although the letter agreement was not submitted to Enterasys's finance group, Enterasys shipped product and booked revenue for the Ariel order, one of the largest from Enterasys's Asia Pacific ("APAC") region for the quarter.

21) Subsequently, Enterasys's outside auditor selected the Ariel transaction as part of its quarterly review and requested a copy of the letter agreement. Following repeated requests by Luacaw, on September 18, 2001 the APAC region forwarded the letter agreement to Enterasys's headquarters, where it was circulated to numerous individuals, including Luacaw.

22) After being advised that the letter agreement did not support revenue recognition because it made Enterasys ultimately responsible for reselling the underlying product and gave Ariel extended payment terms of 150 days, Luacaw and others participated in an effort to present Enterasys's outside auditor with a new, backdated letter agreement without the objectionable terms, notwithstanding that it was more than two weeks after the end of the quarter in which Enterasys had recognized revenue for the Ariel transaction.

23) After assuming responsibility for procuring the new letter agreement, Luacaw sent an e-mail to the APAC office on September 20, 2001 stating that she needed a document, *backdated to August 31, 2001*, that relieved Enterasys of the responsibility for reselling

6

the underlying product and reduced Ariel's payment terms from 150 days to 75 days. Luacaw followed up with a second e-mail to the APAC office stating that the changes to the agreement were needed that day or the revenue "comes off the books.

24) Although it was unwilling to renegotiate or change the actual terms of the letter agreement, Ariel agreed to move the objectionable terms into an undisclosed side agreement and to create a new agreement purporting to give Ariel a 75-day payment term and to make Ariel responsible for reselling the product. Accordingly, the APAC office modified the letter agreement by creating a new backdated first page that contained the fabricated terms, and then forwarded the page to Luacaw and others, who, in turn, forwarded the revised and backdated letter agreement to Enterasys's outside auditor.

25) As a result, Luacaw knowingly participated in a scheme by which Enterasys presented a backdated document to Enterasys's outside auditor that did not reflect the true terms of the Ariel purchase as of the end of the quarter in which Enterasys recognized revenue for this sale.

26) Accordingly, Luacaw participated in Enterasys's improper recognition of $3.9 million in revenue from the Ariel transaction.

### B. Luacaw Knowingly Participated in Numerous Additional Sales Transactions for which Enterasys Improperly Recognized Revenue

27) In addition to the transaction discussed above, Enterasys, through Luacaw and others, improperly recognized revenue from numerous additional sales transactions that, like the foregoing transactions, were tied to material, undisclosed contingencies, including return and exchange rights or promises of future investments, were associated with continuing obligations, including making Enterasys responsible for reselling the underlying product to third parties, or otherwise lacked economic substance.

28) Luacaw knowingly participated in the improper recognition of approximately $2.6 million in revenue from sales to ICS Consolidated, Inc. operating under the name GovStreet USA, LLC ("GovStreet ) during the fourth quarter of Fiscal Year 2001.

29) Luacaw knowingly participated in the improper recognition of approximately $150,000 in revenue in from sales to ParaProtect Services, Inc. ("ParaProtect ) the second quarter of Transition Year 2001 and $804,000 in the third quarter of Transition Year 2001.

30) Luacaw knowingly participated in the improper recognition of approximately $2.9 million in revenue from sales to DiscJockey.com during the first and second quarters of Fiscal Year 2001.

31) In addition, Luacaw knowingly participated in the improper recognition of approximately $701,000 in revenue from sales to TrustWave Corp. during the fourth quarter of Fiscal Year 2001 and the first, second, and third quarters of Transition Year 2001.

32) Finally, Luacaw knowingly participated in the improper recognition of approximately $4.18 million in revenue from sales to WorldLink Technologies, Inc., $2.27 million in revenue from sales to KeyBridge Corp., and $701,000 in revenue from sales to DigitalMojo, Inc.  The revenue from each of these transactions was reported in the second and third quarters of Transition Year 2001.

### IV.  LUACAW COLLABORATED WITH OTHERS TO PROVIDE FALSE, MISLEADING, AND INCOMPLETE INFORMATION REGARDING INVESTMENT DEALS TO ENTERASYS'S OUTSIDE AUDITOR AND THE PUBLIC

33) By the first quarter of Transition Year 2001, the volume of Enterasys's investment deals increased and the quality and financial viability of the companies in which Enterasys considered investing declined.  Aware that Enterasys's outside auditor had identified an investee company's independent ability to pay for product as an important prerequisite to

8

recognizing revenue for an investment deal, Enterasys, through Luacaw and others, carried out a scheme to structure investment transactions so as to conceal investment related revenue from the company's outside auditor.

34) In approximately March of 2001, Enterasys senior management first presented the concept of a three-corner deal during a conference call with Enterasys's investment team, which included Luacaw. During this call, senior management detailed an investment structure in which the investee company would purchase Enterasys product from a distributor or "channel partner rather than from Enterasys directly to conceal from Enterasys's outside auditor the link between Enterasys's investment and the purchase, for which Enterasys would record revenue.

35) During this conference call, and during numerous future weekly conference calls involving Enterasys's investment team, which included Luacaw, the participants openly discussed the purpose of three-corner deals: to conceal from Enterasys's outside auditor the connection between investments and purchases, given that the poor financial condition of investee companies could lead the outside auditor to conclude that the related revenue did not comport with GAAP.

36) After Enterasys structured some of its investments as three-corner deals during the first quarter of Transition Year 2001, its outside auditor became aware of two of these deals and advised Enterasys that the exchange of equity connected to the purchase of product through a third party reseller needed to be "collapsed and viewed as a single transaction to perform the appropriate analysis for revenue recognition.

37) Notwithstanding the outside auditor's admonition, Luacaw and the Enterasys investment team accelerated the use of three-corner deals and continued to conceal the relevant facts from Enterasys's outside auditor during the second quarter of Transition Year 2001.

38) In fact, Luacaw and the investment team worked together to close more than $20 million in investment-related sales during the final week of the second quarter of Transition Year 2001, many of which were structured as three-corner deals to conceal the precarious financial condition of the investee company from Enterasys's outside auditor.

39) Largely due to the improperly recognized revenue generated from these sales, Enterasys rang the opening bell of the New York Stock Exchange on August 6, 2001 and was successfully launched as a public company. Approximately three weeks later, Enterasys announced that it had again achieved its quarterly revenue target.

### V. ENTERASYS'S FALSE FORMS 10-K, 10-Q, AND 8-K
### [13(A), 13A-1, 13A-13, 12B-20 AND 13A-11]

40) As a public company, Enterasys and its directors, officers and employees were required to comply with the federal securities laws and regulations. Those laws and regulations require public companies to file annual, quarterly and current reports that contain financial statements that are prepared in conformity with GAAP and which contain accurate information about the financial condition of the company.

41) Between March 1, 2000 and December 2001, Enterasys filed one annual and six quarterly reports with the SEC.

42) These annual and quarterly reports were materially false and misleading because they contained financial statements that were not prepared in conformity with GAAP. In each report, Enterasys improperly recognized revenue on transactions, misrepresented the

10

income or loss from operations, and misrepresented the net income or loss to common shareholders.

43) As a result of the conduct alleged above, Enterasys violated the reporting provisions of Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13 and 12b-20.

44) With respect to the annual report filed by Enterasys for Fiscal Year 2001 and each of the quarterly reports filed by Enterasys during the relevant period, except the quarterly report for Q3 Fiscal Year 2001, Luacaw aided and abetted Enterasys's violations of Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13 and 12b-20 by knowingly providing substantial assistance of the violations by negotiating, reviewing or otherwise participating in numerous transactions for which revenue was improperly recognized in the financial statements and reported in the filings with the SEC.

45) Enterasys filed three current reports on Form 8-K that reported events on March 28, 2001, July 18, 2001 and July 19, 2001.

46) These Forms 8-K were materially false and misleading because they contained financial statements that were not prepared in conformity with GAAP. In each report, Enterasys or Aprisma improperly recognized revenue on transactions, misrepresented the income or loss from operations, and misrepresented the net income or loss to common shareholders.

47) As a result of the conduct alleged above, Enterasys violated the reporting provisions of Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20.

48) Luacaw aided and abetted Enterasys's violations of Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 by knowingly providing substantial assistance of the violations by negotiating, reviewing or otherwise participating in numerous transactions

for which revenue was improperly recognized in the financial statements and reported in the filings with the SEC.

### VI. FALSE FORM S-8 [17(A) FRAUD]

49) On August 6, 2001, Enterasys filed a Form S-8 registration statement to register shares to be offered under the company's 2001 Equity Incentive Plan. The Form S-8 incorporated by reference the March 2001 Form 10-K and the June 2001 Form 10-Q.

50) The financial statements in the March 2001 Form 10-K and June 2001 Form 10-Q were materially false and misleading as discussed above.

51) Luacaw and others caused the financial statements in Enterasys's March 2001 Form 10-K and June 2001 Form 10-Q to be materially false and misleading by negotiating, reviewing or otherwise participating in numerous transactions for which revenue was improperly recognized in the financial statements and reported in the filings with the SEC.

52) Luacaw knew or was reckless in not knowing that one or more of the transactions included in the revenue recognized by Enterasys were subject to material contingencies that made recognizing revenue on the transaction improper under GAAP.

### VII. AIDING AND ABETTING BOOKS AND RECORDS [13(b)(2)(A)]

53) Enterasys was required to keep books, records, and accounts that accurately and fairly reflected the company's business transactions.

54) As a result of Luacaw's conduct alleged above, Enterasys failed to make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions and thereby violated Section 13(b)(2)(A) of the Exchange Act.

55) These inaccurate books, records and accounts include, but are not limited to, journal entries, postings to the general ledger, reports generated from the general ledger, financial statements, purchase orders, sales transactions files that did not contain side agreements

or other documents defining the material terms of the agreement, and investment files that did not contain adequate documentation of due diligence performed to establish whether the transaction had economic substance.

56) Luacaw was aware that her activities which caused Enterasys to improperly recognize revenue also caused the company to keep inaccurate books, records and accounts that did not accurately record the transactions with its customers.

57) As a result of her conduct, Luacaw knowingly provided substantial assistance leading to Enterasys's inaccurate books, records, and accounts, and thereby aided and abetted Enterasys's violations of Section 13(b)(2)(A) of the Exchange Act.

### VIII. FALSE BOOKS AND RECORDS OR CIRCUMVENTING INTERNAL CONTROLS [13(b)(5) AND RULE 13b2-1]

58) As a result of the conduct alleged above, between March 1, 2000 and December 29, 2001, Luacaw knowingly circumvented or knowingly failed to implement a system of internal accounting controls, or knowingly falsified or caused to be falsified a book, record or account which Enterasys was required to keep reflecting transactions and dispositions of its assets.

### IX. LYING TO AUDITORS [RULE 13b2-2]

59) At times material to this complaint, Luacaw was an officer of Enterasys.

60) Between March 1, 2000 and December 29, 2001, Luacaw directly or indirectly made or caused to be made materially false or misleading statements to an accountant, or omitted or caused to be omitted material facts in connection with the audit, review or examination of the financial statements of Enterasys or in the preparation of filings of any document or report required to be filed with the SEC.

61) Between March 1, 2000 and December 29, 2001, Luacaw directly or indirectly took actions to manipulate, mislead or fraudulently influence the independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of Enterasys that were required to be filed with the SEC.

62) Luacaw directly or indirectly created false books, records and accounts in order to mislead Enterasys's certified public accountants.

63) Luacaw knew or should have known that her actions, if successful, would result in creating financial statements that were materially misleading.

### FIRST CLAIM FOR RELIEF
### Fraud – Violations of Securities Act Section 17(a)(1)
### [15 U.S.C. § 77q(a)(1)]

64) The SEC realleges paragraphs 1 through 63 above.

65) As a result of the foregoing, Luacaw directly and indirectly, with scienter, in the offer or sale of Enterasys securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud.

66) Luacaw thereby violated and unless restrained and enjoined will in the future violate Securities Act Section 17(a)(1).

### SECOND CLAIM FOR RELIEF
### Fraud – Violations of Securities Act Sections 17(a)(2) and 17(a)(3)
### [15 U.S.C. § 77q(a)(2) and (3)]

67) The SEC realleges paragraphs 1 through 63 above.

68) Luacaw directly and indirectly, in the offer or sale of Enterasys securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of Enterasys securities.

69) Luacaw violated and unless restrained and enjoined will in the future violate Securities Act Sections 17(a)(2) and (3).

### THIRD CLAIM FOR RELIEF
### Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

70) The SEC realleges paragraphs 1 through 63 above.

71) Luacaw directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in violation of Exchange Act Section 10(b) and Rule 10b-5.

72) Luacaw violated and unless restrained and enjoined will in the future violate Exchange Act Section 10(b) and Rule 10b-5.

73) Alternatively, by reason of the conduct alleged in paragraphs 1 through 63, Enterasys violated Exchange Act Section 10(b) and Rule 10b-5 thereunder, and Luacaw aided and abetted Enterasys's violations by knowingly and substantially assisting those violations. Unless restrained and enjoined, Luacaw will in the future aid and abet violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

## FOURTH CLAIM FOR RELIEF
**Falsified Books and Records - Exchange Act Section 13(b)(5) and Rule 13b2-1**
**[15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1]**

74) The SEC realleges paragraphs 1 through 63 above.

75) Luacaw knowingly circumvented or knowingly failed to implement a system of internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2) of the Exchange Act.

76) Luacaw violated and unless restrained and enjoined will in the future violate Section 13(b)(5) of the Exchange Act and Rule 13b2-1.

## FIFTH CLAIM FOR RELIEF
**Deceit of Auditors - Exchange Act Rule 13b2-2**
**[17 C.F.R. § 240.13b2-2]**

77) The SEC realleges paragraphs 1 through 63 above.

78) Luacaw directly or indirectly made, or caused others to make, materially false or misleading statements, or omitted, or caused others to omit, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to Enterasys's accountants and outside auditor in connection with an audit or examination of Enterasys's financial statements or in the preparation or filing of Enterasys's documents or reports filed with the SEC.

79) By reason of the foregoing, Luacaw violated and unless restrained and enjoined Luacaw will in the future violate Exchange Act Rule 13b2-2.

## SIXTH CLAIM FOR RELIEF
**False SEC Filings - Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13**
**[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]**

80) The SEC realleges paragraphs 1 through 63 above.

81) Luacaw aided and abetted Enterasys, in that she provided knowing and substantial assistance to Enterasys, which as an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially misleading annual and quarterly reports with the SEC and failed to file with the SEC, in accordance with rules and regulations the SEC has prescribed, information and documents required by the SEC to keep current information and documents required in or with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the SEC has prescribed in violation of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

82) Unless restrained and enjoined, Luacaw will in the future aid and abet violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

**SEVENTH CLAIM FOR RELIEF**
**False Books and Records - Exchange Act Section 13(b)(2)(A)**
**[15 U.S.C. § 78m(b)(2)]**

83) The SEC realleges paragraphs 1 through 63 above.

84) Luacaw aided and abetted Enterasys's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

85) By reason of the foregoing, Enterasys violated Exchange Act Section 13(b)(2)(A), and Luacaw aided and abetted Enterasy's violations.  Unless restrained and enjoined, Luacaw will in the future aid and abet violations of Section 13(b)(2)(A) of the Exchange Act.

**PRAYER FOR RELIEF**

The SEC respectfully requests that this Court:

1)   Find that Luacaw committed the violations alleged;

2)  Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Luacaw from violating, directly or indirectly, or aiding and abetting violations of the laws and rules alleged in this complaint;

3)  Order Luacaw to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, including, but not limited to, salary, bonuses, proceeds from stock sales, and loan forgiveness benefits, plus pre-judgment interest;

4)  Order Luacaw to pay civil penalties, including post-judgment interest, pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], in an amount to be determined by the Court; and

5)  Order such other relief as is necessary and appropriate.

## JURY DEMAND

Respectfully submitted, February 8, 2007.

/s/ Leslie J. Hughes
Leslie J. Hughes (Colo. 15043)

/s/ Jeffrey S. Lyons
Jeffrey S. Lyons (Colo. 27389)

/s James A. Scoggins
James A. Scoggins (Colo. 28094)

Attorneys for Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
Switchboard         303.844.1000
Fax                 303.844.1068